## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QUADRANT 4 SYSTEM CORPORATION, et al[1], | ) | Case No. 17-19689 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |
| | ) | |
| | ) | **Hearing Date: October 31, 2017** |
| _____ | ) | **Hearing Time: 10:30 a.m.** |

### NOTICE OF MOTION

PLEASE TAKE NOTICE that on **Tuesday, October 31, 2017, at 10:30 a.m.,** we shall appear before the Honorable Jack B. Schmetterer of the United States Bankruptcy Court for the Northern District of Illinois, or any other judge sitting in his place and stead, at Courtroom 682 in the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois, and then and there present the **MOTION OF THE DEBTOR FOR THE ENTRY OF AN ORDER: (A) APPROVING THE SALE PROCESS AND BIDDING PROCEDURES WITH RESPECT TO SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR'S BUSINESS; (B) APPROVING FORM OF AND AUTHORIZING THE DEBTOR TO ENTER INTO A STALKING HORSE ASSET PURCHASE AGREEMENT; (C) APPROVING BID PROTECTION AND BREAK-UP FEE; (D) SCHEDULING A PUBLIC AUCTION AND SUBSEQUENT SALE HEARING; (E) AUTHORIZING THE SALE OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (F) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (G) APPROVING THE FORM OF NOTICE AND MANNER OF NOTICE OF SALE HEARING AND PROPOSED ASSUMPTION AND ASSIGNMENT**, a copy of which is hereby served upon you.

CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
NATHAN Q. RUGG, ESQ. (ARDC #6272969)
NICHOLAS R. DWAYNE (ARDC #6308927)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd, Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
Fax (312) 435-1059
**Proposed Counsel for Stratitude, Inc.**

---

[1] Stratitude, Inc. debtor herein, filed this Chapter 11 Case on October 13, 2017 as Case No. 17-30724. This case is being jointly administered with the pending Chapter 11 case of its parent corporation, Quadrant 4 System Corporation, filed on June 29, 2017, Case No. 17-19689, pursuant an order of this Court entered on October 19, 2017 [Docket No. 38]

1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that true and correct copies of this notice and the documents referred to therein were served upon the parties listed on the below service list via CM/ECF, FedEx Overnight, Facsimile and/or Email as listed herein, on October 24, 2017.

By: /s/ Chad H. Gettleman
Chad H. Gettleman, Esq.

## SERVICE LIST

**VIA ECF**
*Office of the United States Trustee*
- Patrick S Layng    USTPRegion11.ES.ECF@usdoj.gov

*Counsel to Official Committee of Unsecured Creditors for Quadrant 4 System Corp*
- Michael A Brandess    mbrandess@sfgh.com, bkdocket@sfgh.com
- Aaron L. Hammer    ahammer@sfgh.com, chorvay@sfgh.com, mbrandess@sfgh.com, joconnor@sfgh.com, mmelickian@sfgh.com, bkdocket@sfgh.com, dmadden@sfgh.com, evandesteeg@sfgh.com

*Counsel to BMO Harris Bank, N.A.*
- Stephanie K. Hor-Chen    schen@vedderprice.com, ecfdocket@vedderprice.com
- Douglas J. Lipke    dlipke@vedderprice.com, ecfdocket@vedderprice.com

*Counsel to Agama Solutions*
- David A. Newby    dnewby@momlaw.com

**Via FedEx Overnight/Worldwide, Facsimile, and/or Email where indicated**

*Counsel to BIP Lender, LLC*
BIP Lender, LLC
c/o Nelson Mullins Riley & Scarborough LLP
ATTN: Peter J. Haley, Managing Partner
One Post Office Square
Boston, MA 02109
Email: Peter.Haley@nelsonmullins.com

*20 Largest Unsecured Creditors*
Accu Source Consulting
ATTN: Chris Jones
T-9,A block, Himagiri Green Forest Apts
Sliver Oak Street, JP Nagar 7th Phase
Bangalore, 78, INDIA
EMAIL: chrisnovelteam@gmail.com

Agile Health Technologies Inc
ATTN: Sasi Gandhamaneni
2728 Forgue Dr., Ste 106
Naperville,IL  60564
EMAIL: sasi@agilehealthtech.com

Benajy Corporation
825 Creekside Place,
Santa Clara,CA  95051

California Creative Solutions Inc
ATTN: Raj Bartwal
13475 Danielson St,  #220,
Poway,CA  92064
FAX: 858-683-2424
EMAIL: rbartwal@ccsglobaltech.com

2

### *20 Largest Unsecured Creditors (cont'd)*

CITY OF FREMONT
39550 Liberty Street, P.O. Box 5006
Fremont, CA 94537-5006
FAX: (510) 494-4754
EMAIL: businesslicense@fremont.gov

Clear Technologies, LLC
4475 South Clinton Ave,
South Plainfield,NJ 07080
EMAIL: info@cleartechnologies.com

Cloud Big Data Technologies LLC
ATTN: Aparna Vishwanathan
12200 Ford Road, Suite A405
Dallas,TX 75234
EMAIL: aparna.v@cloudbigd.com

CQUENT SYSTEMS INC.
ATTN: Naveen R. Kancherla
3415 N Kennicott Ave., Suite B
Arlington Heights,,IL 60004
EMAIL:
naveen.kancherla@cquentsystems.com

EYork Consulting Inc
ATTN: Ashok Abhyankar
1025 First ST SE, Suite 1110
Washington,DC 20003
FAX: 516-654-5001
EMAIL: receivables@eyorkinc.com

Hi Q Software Solutions
2727 Walsh Ave, # 207
Santa Clara,CA 95051
FAX: 530-231-0128

Intellyk Inc
ATTN: Vineet Kumar
15 Corporate Place South, Suite 450
Piscataway,NJ 08854
EMAIL: vineet@intellyk.com

Lead IT Corporation
ATTN: Sampath
1999 Wabash Ave, Suite # 210
Springfield,IL 62704
EMAIL: accounts@leaditgroup.com

Medha Consulting Group, LLC
27 Judson Street, Suite # 6B
Edison,NJ 08837
EMAIL: info@medhagroup.com

Mentis Solutions, Inc
ATTN: MENTIS, FINANCE
55 Carter Drive, Suite 212
Edision,NJ 08817
FAX: 732-518-6770
EMAIL: finance@mentissol.com

Red Mesa, LLC
ATTN: Drew Porter
698 56th Street,
Oakland,CA 94609
EMAIL: drew@redmesa.io

Sandy Lanes Ventures, Inc.
ATTN: Tom Tshontikidis
34065 Castlehaven Road,
Agua Dulce,CA 91390
EMAIL: tomtshontikidis@gmail.com

Upstream Global Services Inc
ATTN: M Kiran
19 B, Crosby Drive, Suite 130
Bedford,MA 01730
FAX: (781) 275-7909
EMAIL: kiranm@upstreamgs.com

VARNAR, INC
ATTN: Lakshmi Yenamandra
46090 Lake Center Plaza, Suite 108
Sterling,VA 20165
FAX: (703) 831-3413
EMAIL: lakshmi@varnar.com

885907_1

Yash Technologies Inc
ATTN: Ravi Kumar Seemarla
455 Avenue of the Cities,
East Moline,IL  61244
FAX: 630-982-0780
EMAIL: ts_yash@yash.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QUADRANT 4 SYSTEM CORPORATION, et al[1], | ) | Case No. 17-19689 |
| | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |
| | ) | |
| | ) | **Hearing Date:  October 31, 2017** |
| | ) | **Hearing Time: 10:30 a.m.** |

**MOTION OF THE DEBTOR FOR THE ENTRY OF AN ORDER:
(A) APPROVING THE SALE PROCESS AND BIDDING PROCEDURES
WITH RESPECT TO SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE
DEBTOR'S BUSINESS; (B) APPROVING FORM OF AND AUTHORIZING THE
DEBTOR TO ENTER INTO A STALKING HORSE ASSET PURCHASE AGREEMENT;
(C) APPROVING BID PROTECTION AND BREAK-UP FEE; (D) SCHEDULING A
PUBLIC AUCTION AND SUBSEQUENT SALE HEARING; (E) AUTHORIZING THE
SALE OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS; (F) AUTHORIZING THE ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (G)
APPROVING THE FORM OF NOTICE AND MANNER OF NOTICE OF SALE
HEARING AND PROPOSED ASSUMPTION AND ASSIGNMENT**

NOW COMES Stratitude, Inc., a California corporation, debtor and debtor in possession

(the "**Debtor**", the "**Company**" or "**Stratitude**"), by and through its undersigned counsel, and

hereby requests the entry of order: (A) approving the sale process and bidding procedures with

respect to a sale of substantially all of the assets of the Debtor's business; (B) approving form of

and authorizing the Debtor to enter into a stalking horse asset purchase agreement; (C) approving

bid protection and break-up fee; (D) scheduling a public auction and subsequent sale hearing; (E)

authorizing the sale of the assets of the Debtor free and clear of liens, claims, encumbrances and

---

[1] Stratitude, Inc., debtor herein, filed this Chapter 11 Case on October 13, 2017 as Case No. 17-30724. This case is being jointly administered with the pending Chapter 11 case of its parent corporation, Quadrant 4 System Corporation, filed on June 29, 2017, Case No. 17-19689, pursuant an order of this Court entered on October 19, 2017 [Docket No. 38].

interests; (F) authorizing the assumption and assignment of executory contracts and unexpired

leases; and (G) approving the form of notice and manner of notice of sale hearing and proposed

assumption and assignment, all pursuant to Sections 105, 363 and 365 of the Bankruptcy Code

and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Motion**").

In support of the Motion, the Debtor respectfully states as follows:

## I.    <u>INTRODUCTION</u>

This Motion seeks the approval of a bidding and sale process under Section 363 of the

United States Bankruptcy Code, 11 U.S.C §§ 101 *et seq.* (the "**Bankruptcy Code**") for the sale

of substantially all of the Debtor's assets related to its ongoing business operations.  As

explained in the "Declaration", as defined below, filed in support of the Debtor's first-day

motions, the Debtor anticipated that this Chapter 11 case would entail a going concern sale for

substantially all of the assets owned and used in connection with the Debtor's "Business", as

defined below[2].

The Debtor is a wholly owned subsidiary of Quadrant 4 System Corporation, an Illinois

corporation ("**Q4**"), debtor and debtor in possession in that certain Chapter 11 case filed June 29,

2017 and pending before this Court as Case No. 17-19689 ("**Q4 Chapter 11 Case**"). The Q4

Chapter 11 Case has likewise consisted on a series of going concern sales of Q4's various

business units, some already closed and others soon to be in process. Prior to the filing of the Q4

Chapter 11 Case and continuing thereafter, Q4 marketed its business units for sale with the

efforts of its financial consultants, Silverman Consulting, Inc. ("**Silverman Consulting**"), and

its investment bankers, Livingstone Partners, LLC ("**Livingstone**"). Q4 has engaged both firms

in the Q4 Chapter 11 Case pursuant to orders of the court.

---

[2] The Debtor's website is www.stratitude.com.

The Debtor's Business has been included in the marketing efforts of Q4, Silverman Consulting and Livingstone.

As such, prior to the filing of this Chapter 11 case on October 13, 2017, the Debtor's assets and Business have been actively marketed[3].  As more fully discussed below, the Debtor, after consultation with Silverman Consulting and Livingstone, has determined that in order to maximize value for the benefit of its creditors, shareholder and other interested parties, a sale of the Business needs to occur on an expedited timeline.

The success of the Business is largely based on maintaining the Debtor's highly skilled employee, independent contractor and third party subcontractor workforce[4] (collectively, the **"Workforce"**) and maintaining customer relationships. Because of the technology skills held by a majority of the Workforce, these individuals are readily employable.  Much of the Workforce is dedicated to a particular customer, making the individual even more employable, often directly by that customer. Absent a prompt resolution of the Debtor's financial difficulties in maintaining the viability of the Business, many in the Workforce will seek, and likely obtain, other jobs, leaving the Debtor with insufficient human resources to service its customers. In fact, due to the uncertainty facing the Debtor and Q4, a number of the individuals in the Workforce have already left the Company, thus making the urgency of the relief sought in this Motion even more acute. The Debtor's representatives have taken all reasonable steps to maintain continuity of the Workforce and sales, with the consent of BMO Harris Bank, N.A. (**"BMO"**), the Debtor's senior secured lender, to fund all operating expenses on a current basis.  But the need to expeditiously transition the operations and assets of the Business is critical.

---

[3] The Debtor will be filing motions to retain Silverman Consulting and Livingstone, as its financial consultants and investment bankers, respectively, in this Chapter 11 case.

[4] The Workforce includes individuals employed, or retained as independent contractors, by the Debtor under an "H-1B Visa" which is a non-immigrant visa issued by the U. S. under the Immigration and Nationality Act, section 101(a)(17)(H) allowing U.S. employers to temporarily employ foreign workers in specialty occupations, such as in information technology.

Indeed, due to the potential loss of value if the sale is not consummated as quickly as possible, under the Debtor's "Cash Collateral Order", as defined below, the Debtor effectively has a deadline to implement a sales process and BMO expects a sale of the Debtor's Business to conclude as soon as practicable given ongoing personnel losses.

Since the marketing process began, the Debtor has generated significant interest in the sale of the assets related to the Business from three prospective purchasers, and some interest from others. The Debtor has now been able to secure an offer it proposes represents a stalking horse offer in the amount of $1,500,000.00 from First Tek Inc., a New Jersey corporation (**"First Tek"**). It is critical that the Debtor has in place sale procedures and a sale hearing as soon as possible to ensure a sale of the Business at a time likely to achieve the highest price possible. In short, in order to maximize the value to be derived from the sale of the Business, the Debtor submits that approval of the sale procedures described below are necessary to realize such value through a fair, open and transparent process.

## II.     FACTUAL BACKGROUND

### A.     The Chapter 11 Case

1.     On October 13, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, initiating the above-captioned bankruptcy case (the "**Chapter 11 Case**"). Since the Petition Date, the Debtor has remained in possession of its assets and has continued to operate its business as a debtor in possession in accordance with 11 U.S.C. §§ 1107(a) and 1108.

2.     No official committee of unsecured creditors has yet been appointed in the Chapter 11 Case, although it is anticipated that for purposes of expediency and cost savings, and given the interrelationship of the Q4 Chapter 11 Case and this Chapter 11 Case, the United States

4

Trustee in this District will permit one or more of the Debtor's creditors to join the Creditors'

Committee formed in the Q4 Chapter 11 Case (**"Committee"**) in place of a separately formed

committee in this Chapter 11 Case.

3.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue

lies properly in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(M).  The statutory predicates for the relief

requested herein are Sections 105(a), 363(b) and 365(b) of the Bankruptcy Code, and the

applicable rules are Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**").

4.      The nature of the Debtor's Business and the factual background relating to the

commencement of the Chapter 11 Case are set forth in more detail in the *Declaration of Robert*

*H. Steele in Support of Chapter 11 Petition and First-Day Motions* [Docket No. 9] (the

"**Declaration**"), which is incorporated herein by reference.[5]

**B.      Stratitude/Agama Transactions and Pending Stratitude/Agama Dispute.**

5.      The background, facts and circumstances leading up to and following Q4's

November 3, 2016 acquisition of 100% of the Debtor's outstanding stock pursuant to a Stock

Purchase Agreement (**"Stratitude SPA"**), and the simultaneous purchase by the Company of

certain assets of its former sister corporation, Agama Solutions, Inc. (**"Agama"**) under an Asset

Purchase Agreement (**"Agama APA"**), are set forth in the Declaration (collectively, the

**"Stratitude/Agama Transactions"**).

6.      Also set forth in the Declaration are the means by which Q4 funded the

Stratitude/Agama Transactions; the events leading to the arrest and filing of the Criminal Action

against the Debtor's former executive officers and directors, Nandu Thondavadi and Dhru Desai

---

[5]  Any capitalized terms not otherwise defined in the Motion shall have the same meaning as ascribed in the Declaration.

5

("**Criminal Defendants**"), a scant 3 weeks after the closings of the Stratitude/Agama

Transactions; and the declarations of events of default under the applicable loan documents

between Q4 and the Company and their secured lenders, BMO and "BIP Lender", as defined

below.

      7.     Following the court approved payments of various net sales proceeds to BMO in

the Q4 Chapter 11 Case, as of the Petition Date, the principal balances owing to BMO and BIP

Lender (collectively, the "**Secured Lenders**") under their applicable loan documents by Q4 and

the Company, jointly and severally, are approximately $8,481,271.41 and $5,000,000,

respectively, for a total of approximately, $13,481,271.41, exclusive of interest, costs and fees.

All such indebtedness is secured by liens in and to substantially all of their respective assets,

including the "Acquired Assets", as defined below, granted by Q4 and the Company to BMO

and BIP Lender as collateral security.

      8.     The primary reason for the difference in the timing of the filing of the Q4 Chapter

11 Case and this Chapter 11 Case was a dispute that arose immediately following the November

3, 2016 closings of the Stratitude/Agama Transactions ("**Stratitude/Agama Closings**"). This

dispute arose from Agama's post-closing failure to transfer all of the assets acquired by the

Company under the Agama APA, and Agama's attendant retention of client revenues arising

from such assets which properly belonged to the Company ("**Stratitude/Agama Dispute**"). In

addition to a necessary physical separation of the Company's and Agama's business offices and

personnel, the Company's new management appointed after the filing of the Criminal Action and

resignation of the Criminal Defendants, also needed to conduct a financial examination to

determine the nature, extent and amount of the claims the Company has against Agama. It was

determined that filing this Chapter 11 Case before the physical separation and financial analyses

were completed would unnecessarily complicate the tasks and increase the costs to conduct an

orderly sale of the Debtor's assets in this Chapter 11 Case.

9.    Since his appointment as CEO of Q4, Mr. Steele has attempted to work closely

with the members of the Debtor's management and staff remaining and/or added after the

Stratitude/Agama Closings. Effective September 30, 2017, a new Board of Directors of the

Company was elected, and Mr. Steele was appointed as CEO of the Debtor. As a result of the

above, Mr. Steele has become familiar with some of the Debtor's pre-November 3, 2016 affairs,

and most, but not all, of its post-November 3, 2016 activities, including current day-to-day

operations, business affairs, and books and records. However, in light of the allegations set forth

in the Criminal Action, other possible matters which may have led thereto, and unknown

interaction, if any, between the Criminal Defendants and others relating to the Stratitude/Agama

Transactions, neither Mr. Steele nor any of the Debtor's other representatives are able to

represent or warrant that any such information reflected herein is complete or without any

inaccuracy. However, significant effort has been made to reflect all information herein as

completely as possible under the circumstances.

**C.    The Debtor's Business**

10.    The Debtor is engaged in the information technology sector as a provider of U.S.

based consulting services to a variety of industries using human resources, facilities and

hardware and software assets located in the United States (collectively, the **"Business"**). The

Company places billable consultants at end-user customers or through other contractors. There is

a markup on each consultant deployed to a client site. The Company's workforce currently

consists of approximately 41 billable consultants; 6 sales, general and administrative employees;

9 independent contractors; and 42 "Margin Share" individuals[6]. It is subject to change at any time. Aside from the location of its employees and customers, the nature of the Business is extremely similar to that certain business unit of Q4 commonly known as "Legacy Staffing" which was sold in the Q4 Chapter 11 Case pursuant to prior orders of the Court.

11.     The Debtor's principal executive offices are located in Q4's Schaumburg Illinois offices, however the Debtor primarily operates its day to day business from a leased facility located at 6601 Koll Center Pkwy, Suite 132, Pleasanton, California 94566.  Projected annual revenues for 2017 are approximately $8 - $10 million. The consideration paid by Q4 for the Stratitude/Agama Transactions was based on asset acquisitions under the Agama APA which projected Stratitude annual revenues of approximately $16 million. This material discrepancy is part of the Stratitude/Agama Dispute.

**D.      The Acquired Assets**

12.     The assets sought to be offered for sale and sold pursuant to this Motion (collectively, the **"Acquired Assets"**) can be summarized as follows:

(a)   All of the Debtor's right, title and interest in and to all customer contracts, including, without limitation, statements of work and purchase orders to the Debtor's customers which are outstanding as of the Closing (collectively, the **"Customer Contracts"**), and to the extent any such Customer Contracts constitute executory contracts under Section 365 of the Bankruptcy Code, subject to the requirements thereof;

(b)   All of Debtor's right, title and interest, if any, in and to any and all contracts, agreements and/or understandings with persons in the Workforce (whether employees of Debtor or independent contractors) used by the Debtor in the Business for the performance of the Customer Contracts, including such individuals subject to Labor Condition Applications or any other certification

---

[6] "Margin Share" individuals are not employees of Stratitude. For the most part, they came from Agama pursuant to the Agama APA, and were trained by Stratitude/Agama, but are now employed by new entities.  Instead of paying these individuals as employees, Stratitude receives compensation (similar to a placement fee) from their new employer for work performed and revenue generated. The compensation received by Stratitude is essentially the margin on their services billed to customers.

or petition with U.S. Citizenship and Immigration Services, the U.S. Department of Labor, or the U.S. Department of Homeland Security (with assignment of each employee's or consultant's employment to the buyer such that the obligations owing to such employees or independent contractors shall remain the same but for the identity of buyer as their new employer) (collectively, the **"H-1B Employees"**), and to the extent any such agreements with Workforce constitute executory contracts then subject to the applicable provisions of Section 365 of the Bankruptcy Code;

(c)  All books, records, financial information, and documents pertaining to the Business, including, without limitation, historical revenue information per customer; customer files, lists and sales records; all expense and costing information; supplier files, lists, records and literature; all data and other information stored on hard drives (including those located on remote servers, whether operated by the Debtor or by third party providers), but expressly excluding, among other items to be more fully described in the underlying asset purchase agreement(s): (i) all books, records and other documents an information necessary to prosecute any and all "Causes of Action", as defined below; (ii) certain financial records, income tax returns, checkbooks, cancelled checks; and (iii) and any other documentation necessary for the Debtor to conclude the administration of the Chapter 11 Case;

(d)  Excluding only the "Seller's Agama Claims", as defined below[7], all trade and other receivables and rights to payments arising from products and services sold in the operation of the Business;

(e)  All intangible assets or intellectual property pertaining solely to the Business, including, without limitation, owned software (source code and object code), to the extent assignable and transferable under applicable law, and goodwill;

(f)  All furniture, fixtures, computers, office equipment, furnishings, machinery, equipment, parts, accessories, telephone and fax equipment and systems, supplies and other tangible personal property pertaining solely to the Business, if any;

(g)  Subject to the provisions of Section 365 of the Bankruptcy Code, all of the Debtor's rights, title and interests in and to all permits, licenses and approvals, to the extent they are assignable, if any; and

(h)  Subject to the provisions of Section 365 of the Bankruptcy Code, all of the Debtor's rights, title and interests in and to any and all other executory

---

[7]  **"Seller's Agama Claims"** shall collectively mean any and all claims, causes of action and litigation rights existing as of the Closing in favor of Seller again Agama arising out of, under or related to the Stratitude/Agama Transactions and Stratitude/Agama Dispute.

contracts or unexpired leases selected by the purchaser to be assumed and assigned by the Debtor concurrently with the sale of the Acquired Assets.

**E.    Liens on the Acquired Assets**

13.    The Acquired Assets are subject to the <u>pre-petition</u> secured claims of[8]:

(a)    BMO pursuant to that certain Credit Agreement dated as of July 1, 2016, which provided Q4 with a credit facility of up to $25,000,000 as evidenced, by among other things, a : (i) $7,000,000 Revolving Credit Facility; (ii) $13,000,000 Term Loan; and (iii) $5,000,000 Cap Software Facility, as amended on November 3, 2016 (collectively, the **"BMO Loan"**); and

(b)    BIP Lender, LLC, as collateral agent for BIP Quadrant 4 Debt Fund I, LLC, as lender (**"BIP Lender"**)[9] which provided Q4 with that certain Senior Subordinated Credit Agreement dated November 3, 2016 in the principal amount of $5,075,000.

14.    The Acquired Assets are also subject to the <u>post-petition</u> secured claims of BMO arising out of that *certain Interim Order (I) Authorizing Use Of Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant To 11 U.S.C. §§ 361 And 363, And (III) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001*, entered on October 20, 2017 [Docket No. 41] (as may be supplemented from time to time, the "**Interim Cash Collateral Order**")[10] and the "Pre-Petition Agreements" of BMO, as also defined in the Interim Cash Collateral Order. But for the anticipated receipt of the Stalking Horse Offer and the

---

[8] As part of the Stratitude/Agama Transactions, the Debtor executed guaranties in favor of both Secured Lenders for all of Q4's indebtedness, and secured both such guaranties with blanket liens on all of the Debtor's assets, including the Acquired Assets.
[9] BIP Lender is affiliated with Buckhead Investment Partners, a wealth management company based in Atlanta, Georgia, www.buckheadinvestments.com

[10] Subject to the entry of a final cash collateral order not yet entered.  As of the date of this Motion, the extent and validity of liens on all assets in this estate in favor of BMO and/or BIP Lender remains subject to the right of any creditor, including, a Committee, if formed, to challenge such liens.

Debtor's willingness to promptly file this Motion and commence the sale and bidding process,

BMO would not have consented to the entry of the Interim Cash Collateral Order.

15.     Pursuant to the Interim Cash Collateral Order, and budget attached thereto, the

Secured Lenders agreed that the Debtor can use the Secured Lenders' cash collateral through

December 29, 2017.

**F.     Marketing of the Acquired Assets**

16.     With the assistance of Silverman Consulting and Livingstone, the Debtor has

conducted an aggressive marketing process prior to the commencement of the Chapter 11 Case,

and continuing thereafter, which has created significant interest in the Business.

17.     Silverman Consulting marketing efforts.   The marketing efforts undertaken by

Silverman Consulting since its retention by Q4 on or about January 16, 2017 encompassed the

Debtor's Business and included the following:

- Between January and October 2017, initiated discussions and communications with numerous prospective buyers, who provided expressions of interest for the Debtor's Business;
- Prepared and circulated due diligence information, including detailed financial projections for the Debtor's Business to prospective buyers;
- To facilitate flow of information to prospective buyers, established an online data room with a third-party vendor (**"Data Room"**), the management and administration of which has subsequently been handed over to Livingstone;
- Arranged and participated in in-person management presentations made to prospective buyers and due diligence related meetings with prospective buyers that occurred between January and October 2017;
- Been involved in frequent telephonic and email discussions with multiple prospective buyers for the Business, with such communications involving responding to due diligence queries, facilitating flow of information between the Debtor's management team, Board and prospective buyers, including introducing prospective buyers' professionals (investment bankers and attorneys) to the Debtor's professionals (investment bankers and attorneys) and providing status and sale process updates to prospective buyers;

- Assisted the Debtor and Livingstone in obtaining expressions of interest from various parties and written offers from three different purchasers for the Business; and
- Assisted the Debtor's counsel with its preparation of a sample asset purchase agreement for the Business (**"Sample APA"**), which was put into the Data Room and available to prospective purchasers[11].

18.    <u>Livingstone marketing efforts.</u>    Livingstone was initially engaged by Q4 on or about February 14, 2017. Its services were officially suspended by Q4's then Board on or about March 8, 2017 while Q4 and the Company attempted to finalize the BMO Forbearance Agreement. Livingstone was reinstated in or around early to mid-April 2017. Throughout its engagement, Livingstone's activities in connection with Q4's marketing efforts have encompassed the Debtor's Business and included the following:

- Worked closely with the Debtor's management and Silverman Consulting to quickly analyze the Debtor's Business;
- Participated in multiple strategy session (meetings/calls) with the Debtor and the Debtor's other advisors to discuss the optimal strategy to maximize asset values, including transaction structure considerations, process considerations, timing issues, data sufficiency, etc.;
- Worked closely with the Debtor's management and Silverman Consulting to evaluate non-binding indications of interest that have been received by the Debtor;
- Worked with the Debtor's management and Silverman Consulting to establish the Data Room to facilitate potential buyer due diligence;
- Delivered a preliminary list of potential buyers to the Debtor;
- Participated in meetings and on conference calls with BMO representatives;
- Prepared a teaser ad to be provided to potential buyers;
- Prepared a detailed Confidential Information Presentation to provide to those potential buyers that executed confidentiality agreements;
- Reviewed and help negotiate confidentiality agreements with potential buyers;

---

[11] The Debtor's counsel has long believed that providing prospective purchasers with a sample asset purchase agreement tailored to the particular transaction, and encouraging them to submit their bids based upon such a sample, is the most efficient and cost effective way to promote the submission and comparison of bids in Section 363 sales, and selection of a winning bid. All bidders will be encouraged to submit offers substantially in the form of the Sample APA, as did the Stalking Horse Bidder, but shall not be obligated to do so.

- Contacted over 130 potential buyers for the Business and/or the Q4 business units;
- Hosted multiple different buyers for diligence sessions and meetings with the Debtor's management; and
- Attended meetings between potential buyers and the Debtor's management at various locations in California and Illinois.

### III.    STALKING HORSE OFFER

19.    The Debtor has received the following offer of First Tek, Inc., a New Jersey corporation (**"First Tek"**), dated as of October 20, 2017 for the purchase of the Acquired Assets and Business in the amount of $1,500,000.00 (**"Stalking Horse Offer"**). A copy of the Stalking Horse Offer is attached hereto as Exhibit A [12] and made a part hereof.

20.    In consultation with Silverman Consulting and Livingstone, the Debtor evaluated the terms and benefits of all offers vying for stalking horse status.  In its reasonable business judgment, the Debtor concluded that the Stalking Horse Offer represents the highest and best bid to purchase the Acquired Assets received to date, and is on terms, including the proposed "Bid Protection" and "Break-Up Fee", as defined below, that provide the best opportunity to conclude a sale process for the Business that will maximize the asset values for the benefit of the Debtor's estate, its creditors, equity security holder and other interested parties.

21.    The Debtor will continue marketing the Acquired Assets, in bulk, in an effort to solicit further interest from both strategic and financial buyers pursuant to the "Sale Process", as defined below.

---

[12] Given the confidential nature of the information contained in the exhibits to the Stalking Horse Offer (**"Exhibits"**), First Tek has conditioned the submission of the Stalking Horse Offer on the Debtor not attaching all of the Exhibits to Exhibit A hereto, as filed in the Chapter 11 Case. The Debtor has acquiesced, but has advised First Tek that: (a) this Motion would clearly set forth the manner in which the Debtor intends to proceed with the Exhibits; (b) any party executing a Confidentiality Agreement, as required under the Bidding Procedures and prior marketing efforts, will be entitled to see un-redacted copies of the Exhibits upon request in connection with their consideration of whether to submit a competing bid or otherwise; and (c) should the Stalking Horse Offer become the prevailing bid for the Business which is approved by the Court, then all Exhibits, without redaction, will be attached to such prevailing bid to be attached to the Court's order confirming the sale.

22.     The Stalking Horse Offer is subject to higher and better "Qualifying Bids" received at the "Auction", as those terms are defined below, and is conditioned on the execution and filing of executed asset purchase agreements, substantially in the form of the Stalking Horse Offer, and, in part, upon First Tek receiving the Bid Protection provided therein.

23.     The Stalking Horse Offer can be summarized as follows:

(a)     Purchase of Acquired Assets.  First Tek will acquire all of the Debtor's right, title and interest in and to the Acquired Assets of the Business which is the subject of the Stalking Horse Offer, free and clear of all liens, claims, encumbrances and interests.

(b)     Purchase Price. The consideration for the Acquired Assets (**"Purchase Price"**) shall be the sum of: (i) a cash payment in the amount of $1,500,000.00 (**"Initial Bid Amount"**), as may be further adjusted by: (A) the "Receivables Adjustment", as defined below[13]; and (B) as a result of competitive bidding at the Auction; and (ii) an amount equal to the Assumed Liabilities to be set forth in the Stalking Horse Offer.

(c)     Assumed Liabilities.  First Tek will assume under the terms of the Stalking Horse Offer: (i) any or all liabilities or obligations of any kind or nature whatsoever arising from and after the Closing out of, under, or related to the Acquired Assets; and (ii) all costs and expenses to be incurred in connection with the fulfillment of the Customer Contracts and other Assumed Contracts (including all cure costs), provided however, that First Tek's liability for cure costs under its Assumed Contracts is limited to $100,000.00. Cure costs in excess of such limitations shall be borne by the Debtor. The Debtor does not believe cure costs will exceed such cap.

(d)     Deposit.  First Tek has made an earnest money deposit in an amount equal to $150,000.00, representing ten percent (10%) of the Initial Bid Amount, concurrently with the submission of the Stalking Horse Offer (the **"Deposit"**). The Deposit is being held in the non-interest bearing IOLTA trust account maintained by the Debtor's counsel, Adelman & Gettleman, Ltd. (**"A&G"**) at JPMorgan Chase Bank, N.A. (the "**Trust Account**") in accordance with the terms of the Stalking Horse Offer.

(e)     Representations and Warranties.     The Stalking Horse Offer contains such representations and warranties of the Debtor as are customary for sales of assets in a Chapter 11 case. All representations and warranties shall terminate within one (1) year of the Closing.  Except as largely set forth in the Stalking Horse Offer, the Acquired Assets are being sold "AS IS, WHERE IS".

---

[13]The **"Receivables Adjustment"** is a dollar for dollar adjustment increasing the purchase price by the amount, if any, the Receivables aged less than 90 days at Closing exceed $1,000,000, and reducing the purchase price by the amount, if any, $1,000,000 exceeds the amount of the Receivables aged less than 90 days at Closing.

(f)     Conditions of Closing / Termination Events.   The Stalking Horse Offer requires, among other things as set forth therein, the Debtor to: (i) obtain the entry of the "Bidding Procedures Order", as defined below; (ii) conduct the Auction and obtain the entry of the "Sale Order", as defined below, following all requisite and appropriate notice to the creditors and other interested parties in the Chapter 11 Case, and such other parties as are deemed necessary; and (iii) obtain any necessary approvals and consummate the transactions contemplated in the Stalking Horse Offer (presuming it is the winning bid at the Auction and approved by this Court pursuant to the terms and conditions of the Sale Order) no later than December 1, 2017 (**"Closing"**).  In addition thereto, the Stalking Horse Offer contains such other closing conditions and termination events which are customary for transactions of this type and size.

(g)     Insider and Employee Matters.   First Tek shall have the right, but not the obligation, to make offers of employment to any and all of the Debtor's employees in the Business, provided however, that any and all offers for employment to any "insiders" of the Debtor, as defined in Section 101(31) of the Bankruptcy Code, shall be fully disclosed to the extent possible in Stalking Horse Offer, or at the "Sale Hearing", as defined below.

(h)     Executory Contracts.   There are various executory contracts and unexpired leases, which First Tek is requiring be assumed and assigned at Closing. The Stalking Horse Offer has, or will have, pursuant to the procedures proposed in the Bidding Procedures Order a list of executory contracts to be assumed.

(i)     Bid Protection and Break-Up Fee.   In consideration of First Tek submitting the Stalking Horse Offer and serving as the stalking horse for purposes of further competitive bidding for the Acquired Assets, the Stalking Horse Offer requires the Court's approval of any Qualifying Bid's Initial Bid Amount to be in the amount of at least $1,700,000.00 (13.3% of Initial Bid Amount) (the "**Bid Protection**"), and a break-up fee payable to First Tek of 5% of the Initial Bid Amount plus $75,000.00 for reasonable reimbursable expenses (the "**Break-Up Fee**") in the event that the Court approves a higher and better offer as a result of the Auction, First Tek is not in default under the Stalking Horse Offer, and such higher and better transaction closes.

### IV.     PROPOSED SALE PROCESS, BIDDING PROCEDURES, AND BID PROTECTION

24.     The Debtor requests the entry of an order (the "**Bidding Procedures Order**") in substantially the form filed herewith and incorporated herein: (a) approving the entire sale process as set forth in this Motion (**"Sale Process"**); (b) approving the proposed bidding

procedures ("**Bidding Procedures**") attached as <u>Exhibit B</u> and incorporated herein; (c)

approving the Bid Protection; (d) scheduling an auction for the sale of the Acquired Assets to

"Qualifying Bidders", as defined below, pursuant to the Bidding Procedures (the "**Auction**") and

subsequent hearing to consider the sale of the Acquired Assets;  (e) authorizing the assumption

and assignment of executory contracts and unexpired leases; (f) approving the form and manner

of "Notice of Sale", as defined below, attached hereto as <u>Exhibit C</u>; and (g) approving the form

and manner of notice of the proposed assumption and assignment of executory contracts and

unexpired leases attached hereto as <u>Exhibit D.</u>

25.      The Debtor also requests that at the Sale Hearing, the Court enter an order ("**Sale**

**Order**"), *inter alia*:, (a) authorizing the Debtor to sell the Acquired Assets free and clear of any

and all liens, claims, encumbrances and interests pursuant to 11 U.S.C. §§ 105 and 363(b) and (f)

in accordance with the highest and best offer submitted at the Auction pursuant to the Sale

Process and approved by this Court at the Sale Hearing ("**Prevailing Bidder**" or "**Prevailing**

**Bid**"); (b) granting good faith purchaser protections to the Prevailing Bidder pursuant to 11

U.S.C. § 363(m); and (c) granting all relief requested in the Sale Motion and such other relief as

may be warranted under the circumstances.

26.      In order to facilitate the Sale Process, the Debtor, in consultation with Silverman

Consulting, Livingstone, BMO and the Committee, has developed the sale procedures for use in

connection with the sale of the Acquired Assets.

A.      <u>**The Sale Process and Bidding Procedures**</u>[14]

27.      The Debtor proposes the following Bidding Procedures:

---

[14] The summary of the Bidding Procedures set forth herein is provided for informational purposes only. Interested parties are directed to read the entire Bidding Procedures. To the extent of any discrepancy between the summary description of the proposed Bidding Procedures contained in this Motion and the actual Bidding Procedures and Bidding Procedures Order, the terms of the Bidding Procedures and Bidding Procedures Order shall control.

(a)     **The Assets Offered for Sale.**  The Debtor is offering the Acquired Assets for sale in bulk only. The Acquired Assets will not be sold piecemeal.

(b)     **Potential Bidder.**  Each person wishing to participate in the Sale Process ("**Potential Bidder**") must execute a non-disclosure agreement in form and substance acceptable to the Debtor prior to gaining access to the Debtor's due diligence information and the Data Room.

(c)     **Due Diligence/Bid Deadline.**  Potential Bidders shall be authorized to perform due diligence with respect to the acquisition of the Acquired Assets at their sole cost and expense to be completed on or before the close of business on or before November 20, 2017 ("**Bid Deadline**").

(d)     **Qualifying Bids.**  For purposes of the Sale Process, a "**Qualifying Bid**" shall mean a *bona fide*, binding, and duly executed written cash offer(s) to purchase the Acquired Assets received on or before the Bid Deadline, which: (i) may, but is not required to, be in the form substantially similar to the Sample APA; (ii) satisfies the Bid Protection requirement; (iii) remains irrevocable: (A) until the approval of a Prevailing Bid and a "Runner-Up Bid" at the Sale Hearing, as defined below; and (B) if approved at the Sale Hearing as either the Prevailing Bid or the Runner-up Bid, remain irrevocable for a period of the lesser of (X) the closing of the Prevailing Bid, or (Y) ten (10) business days after the conclusion of the Sale Hearing; (iv) is not conditioned upon obtaining financing; (v) contains sufficient assurances that the Potential Bidder's representative is legally empowered, by power of attorney or otherwise, to both bid on behalf of the Potential Bidder and also to complete and sign, on behalf of the Potential Bidder, a binding and enforceable bid, including as such bid may be revised at the Auction; (vi) is accompanied by a wire transfer in an amount equal at least to $170,000.00 to be held as the Deposit in the Trust Account as set forth above, and as described in the Stalking Horse Offer; (vii) is accompanied by such evidence reasonably acceptable to the Debtor demonstrating such bidder's ability to close the proposed transaction and as otherwise described in the Bidding Procedures; and (viii) is served upon the required parties listed in the "Notice of Sale", as defined below.  All Qualifying Bids must disclose the material terms and conditions of any contemplated employment or consulting agreement with any former or current insider of the Debtor.

(e)     **Determination of Qualifying Bid.**  The Debtor, in its sole discretion and in the exercise of its business judgment, but following consultation with Silverman Consulting, Livingstone, and counsel for the Secured Lenders and the Committee, shall determine whether any competing bid(s) constitute a Qualifying Bid.  On or before a date specified in the Bidding Procedures, the Debtor will so notify the party submitting same (each, a "**Qualifying Bidder**").  For the avoidance of doubt, First Tek shall be considered a Qualifying Bidder without further action.  Further, the Stalking Horse Offer shall be considered a Qualifying Bid.

Notwithstanding anything herein to the contrary, all bids submitted prior to the Bid Deadline as set forth above are subject to the approval of this Court after taking into account the best interests of the Debtor's estate.

(f)     **Auction and Sale Hearing.**  The Debtor shall conduct the Auction of the Acquired Assets at the offices of its counsel, Adelman & Gettleman, Ltd., 53 West Jackson Boulevard, Suite 1050, Chicago, Illinois 60604 commencing at 10:00 a.m. (Central time) on Tuesday, November 28, 2017, or such other date and time established by the Court.  The Debtor intends to publish notice of the Auction in the *Chicago Tribune* weekly for two (2) consecutive weeks preceding the Auction.  Only Qualifying Bidders shall be entitled to make a bid at the Auction.  The Stalking Horse Offer shall be the opening bid for the Acquired Assets. All bids subsequent to the initial Bid Protection overbid at the Auction shall be in increments of at least $50,000.00 or such other amounts as determined by the Debtor to be in the best interest of the estate.  All such bids shall be made as a matter of record. If there are no competing Qualifying Bids received by the Bid Deadline, the Auction shall be deemed cancelled.

Any Qualifying Bid that is determined by the Debtor in accordance with these Bidding Procedures as the Prevailing Bid or the Runner-Up Bid will be subject to approval by the Court.  The sale hearing to approve the Prevailing Bid and designation of the Runner-Up Bid as an alternative Prevailing Bid (the "**Sale Hearing**") will be held before the Honorable Jack B. Schmetterer, United States Bankruptcy Judge, in the United States Bankruptcy Court, Northern District of Illinois, Eastern Division, in Courtroom 682 in the Dirksen Federal Building, 219 S. Dearborn Street, Chicago, Illinois at __:__ **a.m. (Central time) on** _____, _____, **2017,** or such other time as may be ordered by the Court and announced by the Debtor to all Qualifying Bidders at the Auction.

(g)     **Sale Objections.**  Any objection to the sale of the Acquired Assets may be presented at the Sale Hearing.

(h)     **Identification of Prevailing Bid and Runner-Up Bid.**  Upon the conclusion of the Auction, the Debtor, in its sole discretion and in the exercise of its business judgment, but following consultation with Silverman Consulting, Livingstone, counsel for the Secured Lenders and the Committee, shall identify the Prevailing Bid and the Runner-Up Bid, if any.  At the Sale Hearing, the Debtor shall present to the Court the Prevailing Bid, and if applicable, the Runner-Up Bid, and request the entry of the Sale Order approving such bid(s) subject to the terms thereof in a form reasonably satisfactory to counsel for the Prevailing Bidder and Runner-Up Bidder.  In the event the Auction is cancelled as set forth above, then the Stalking Horse Offer shall be deemed the highest and best offer for Acquired Assets and constitute the Prevailing Bid.

(i) **Runner-Up Bid.** The Debtor, in the exercise of its business judgment, may, but shall not be obligated to, request that the Court determine at the Sale Hearing the next highest and best bid for the Acquired Assets other than the Prevailing Bid ("**Runner-Up Bid**"). In the event the party making the Prevailing Bid refuses or is otherwise unable to close in accordance with the terms thereof on or before December 1, 2017, then, in such event, the Debtor, in its sole and absolute discretion, may accept the Runner-Up Bid in writing to such bidder within two (2) business days thereafter, in which case, the party submitting the Runner-Up Bid ("**Runner-Up Bidder**") shall be required to consummate the transactions contemplated in the Runner-Up Bid at the purchase price so offered without further act, deed or order of Court within the following five (5) business days after such acceptance. If the Debtor fails to timely notify the Runner-Up Bidder, then the Runner-Up Bid shall be considered null and void and of no legal effect whatsoever upon the Debtor's return of the Deposit to such party which shall occur within three (3) business days after the conclusion of such two (2) business day notice period, and each party shall otherwise suffer its own losses, costs, expenses or damages arising out of, under or related to the underlying asset purchase agreement. If necessary, the provisions herein concerning the acceptance and closing of a Runner-Up Bid are subject to further order of the Court regarding the Debtor's ability to fund operations pursuant to the Interim Cash Collateral Order.

(j) **Assets Sold As Is, Where Is.** The Acquired Assets shall be sold on an "**AS IS, WHERE IS**" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or estate except to the extent expressly set forth in the Prevailing Bid, and if applicable, the Runner-Up Bid. Except as otherwise provided in such agreement(s), all of the Debtor's rights, title and interests in and to the Acquired Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and therein in accordance with Section 363 of the Bankruptcy Code, with all such valid interests to attach to the net proceeds of the sale of the Acquired Assets.

(k) **Return of Earnest Money Deposits.** Any entity that submitted a Deposit and is not designated a Qualifying Bidder shall has its Deposit returned on or before the third (3rd) business day after the designation of Qualifying Bids under the Bidding Procedures. Any Qualifying Bidder that is not declared either a Prevailing Bidder or a Runner-Up Bidder shall have its Deposit returned within three (3) business days after the Auction. The Deposit of the Runner-Up Bidder shall be returned in accordance with sub-paragraph (i) above.

(l) **Buyer's Inspection Rights.** Each Qualifying Bidder shall be deemed to acknowledge and represent in its Qualifying Bid that it has had an opportunity to inspect and examine the Acquired Assets and to conduct any and all due diligence regarding the Acquired Assets prior to making its offer to the extent it has deemed necessary and appropriate, that is has relied solely upon its own independent

review, investigation and/or inspection of any documents and/or Acquired Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in its Qualifying Bid.

**B.**      **The Proposed Bid Protection and Break-Up Fee**

28.      In order to induce First Tek to expend the time, energy and resources necessary to submit a "stalking-horse bid", the Debtor has agreed to request that this Court approve the Bid Protection and the Break-Up Fee, as more fully set forth in the Stalking Horse Offer.

29.      The Break-Up Fee represents expenses and costs, including employee costs and out of pocket expenses for due diligence and for professional and other related fees and expenses, incurred by or on behalf of First Tek in the preparation of the Stalking Horse Offer and their participation in the Sale Process.

**V.**      **ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

30.      As part of the Motion, the Debtor seeks authority to assume and assign the executory contracts and unexpired leases to be identified in the Prevailing Bid.  Within two (2) business days of the Bid Deadline, the Debtor shall send notice, by facsimile or next-business day delivery, to all non-debtor parties to any executory contracts or unexpired leases which the Debtor may elect to assume and assign in conjunction with the sale of the Acquired Assets (the "**Contracts and Leases**", and each, a "**Contract/Lease**").  The Contracts and Leases include, but may not be limited to, those agreements which have been identified by the Qualifying Bidders as Contracts and Leases which they would have the Debtor assume and assign in connection with their proposed purchase of the Acquired Assets (collectively, the "**Assumed Contracts**").  The Assumed Contracts will likely consist of, among others: (a) certain

intellectual property licenses of which a Debtor is licensee or licensor; (b) the Customer

Contracts, including statements of work and purchase orders to Seller from the Business

customers which are outstanding as of the Closing; and (c) certain contracts associated with the

operation of the Business.

     31.    Because of the need to close any transaction as quickly as possible in order to

minimize any diminution in the value of the Acquired Assets, the Debtor proposes the following

procedures for assuming and assigning executory contracts and unexpired leases:

(a)    Within two (2) business days of the Bid Deadline, the Debtor will file a *Notice of Potential Assumption and Assignment of Executory Contracts and Unexpired Leases* in the form attached hereto as <u>Exhibit D</u> (the **"Assumption/Assignment Notice"**) with the Court and serve same on each non-debtor party to the Contracts and Leases. The Assumption/Assignment Notice shall: (i) identify the Qualifying Bidders; (ii) state the cure amounts that the Debtor believes are necessary to assume and assign such Contracts and Leases pursuant to Section 365 of the Bankruptcy Code (the **"Cure Amount(s)"**); and (iii) notify the non-debtor party that such party's Contract/Lease may be assumed and assigned to a purchaser of the Acquired Assets (the **"Proposed Assumption/Assignment"**).

(b)    Unless the non-debtor party to a Contract/Lease files or presents at the Sale Hearing an objection (the **"Assignment Objection"**) to: (i) its scheduled Cure Amount and/or (ii) the Proposed Assumption/Assignment at or before the Sale Hearing, then such non-debtor party: (A) will be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Contract/Lease, and the Debtor shall be entitled to rely solely upon the Cure Amount; and (B) will be deemed to have consented to the assumption, assignment and/or transfer of such Contract/Lease, and will be forever barred and estopped from asserting or claiming against the Debtor, the Prevailing Bidder and/or the Runner-Up Bidder, or any other assignee of the relevant Contract/Lease that: (1) any additional amounts are due or defaults exist, or conditions to assumption, assignment and/or transfer must be satisfied, under such Contract/Lease; or (2) the Prevailing Bidder or Runner-Up Bidder has failed to provide adequate assurance of future performance as required by Section 365 of the Bankruptcy Code.

(c)    In the event that the Debtor and any objecting party are unable to consensually resolve any Assignment Objection prior to the Sale Hearing, the Debtor requests that the Court resolve any such Assignment Objection at the Sale Hearing or as soon thereafter as practicable.

(d)     At the Sale Hearing, the Debtor shall request entry of an order approving the assumption and assignment of any Contracts and Leases to the Prevailing Bidder upon terms which the Prevailing Bidder agrees to accept and assume.

32.     The Debtor submits that the foregoing procedures are fair and appropriate under the circumstances.  Non-debtor parties to the Contracts and Leases will receive at least five (5) calendar days' notice of the potential assumption, proposed Cure Amount, and the potential purchasers. The Debtor believes with respect to most of the Contracts and Leases, little to no Cure Amount is required.

## VI.     AUTHORITY FOR RELIEF REQUESTED

### A.     The Proposed Sale of the Acquired Assets Satisfies the Business Judgment Rule.

33.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  To approve the use, sale or lease of property outside the ordinary course of business, there must be some "articulated business justification." *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *see also Stephens Indus., Inc., v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 145-47 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012); *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999).

34.     Once a valid business justification made in the ordinary course of business is established, the business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the Debtor." *In re S.N.A. Nut Co.*, 186 B.R. 98

(Bankr. N.D. Ill. 1995) (internal citation omitted). Similarly, a court will defer to the debtor's

judgment to make a sale outside the ordinary course of business pursuant to Section 363, when

the debtor has "sound business reasons for making the sale." *Schipper*, 933 F.2d at 515; *see also*

*In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) ("If a valid business

justification exists, then a strong presumption follows that the agreement at issue was negotiated

in good faith and is in the best interests of the estate; the burden of rebutting that presumption

falls to parties opposing the transaction.").

35.     Indeed, when applying the "business judgment" rule, courts show great deference

to the debtor's decision-making. *See Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R.

310, 315 (Bankr. D. Utah 1981). Therefore, the relief requested in this Motion should be granted

if the Debtor demonstrates a sound business justification therefor. *See Schipper*, 933 F.2d at

515; *Lionel*, 722 F.2d at 1071; *Del. Hudson Ry.*, 124 B.R. at 179.

36.     As explained above, the Debtor has sound business justifications for selling the

Acquired Assets at this time. Without the filing of this Motion and the commencement of the

Sale Process requested herein, the Debtor does not have the resources necessary to maintain the

value and viability of the Business. Moreover, the value of the Business is predicated on an

expeditious and seamless transition of the Customer Contracts and customer relationships related

thereto. The cessation of the Business will lead to an immediate, irreparable and significant

decline in the value of the Acquired Assets. The Debtor therefore has determined, based upon its

business judgment, the most viable option for maximizing the value of its estate is through a

prompt sale of the Acquired Assets.

37.    Based upon these factors and those discussed above, the Debtor has demonstrated

a sound business justification for the proposed sale of the Acquired Assets pursuant to the

Bidding Procedures.

**B.    The Bid Protection and Break-Up Fee are Fair and Reasonable.**

38.    The Debtor believes that a compelling need exists to authorize granting of the Bid

Protection and the Break-Up Fee in order to induce First Tek to submit its Stalking Horse Offer

for the Acquired Assets within the time frame mandated by the Debtor's business circumstances.

Moreover, the Debtor believes that the proposed Bid Protection and the Break-Up Fee is fair and

reasonable in relation to any Qualifying Bid received and will maximize the benefit to the estate

by providing an incentive to potential purchasers to expend the resources necessary to formulate

offers for the Acquired Assets in excess of the Stalking Horse Offer. *See, e.g., In re Kirk Corp.*,

No. 09 B 17236, 2009 WL 6769950, at *16 (Bankr. N.D. Ill. July 30, 2009) (approving break-up

fee and overbid protection); *In re CXM, Inc.*, 307 B.R. 94, 103-04, 106 (Bankr. N.D. Ill. 2004)

(awarding break-up fee and noting that it "makes economic sense" to establish overbid

protections as well); *In re Kmart Corp.*, Case No. 02-B-02474 (Bankr. N.D. Ill. Aug. 29, 2002)

(authorizing break-up fee and overbid protections).

39.    As has been noted, the Break-Up Fee such as that proposed here "is incentive

payment to a prospective purchaser with which a company fails to consummate a transaction."

S.N.A. Nut Co., 186 B.R. at 101.  "Agreements to provide breakup fees or reimbursement of fees

and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking

horse' which attracts more favorable offers."  Id.; see also In re 995 Fifth Ave. Assocs., L.P., 96

B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentive may "be legitimately necessary to

convince a 'white knight' to enter the bidding by providing some form of compensation for the

risks it is undertaking") (internal citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179
(CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1989) ("[bidding incentives] are meant to
compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more
favorable offers").

40.     In the bankruptcy context, the test for determining whether a proposed break-up
fee should be approved is whether it is in the best interests of the estate. See S.N.A. Nut. Co.,
186 B.R. at 104; see also In re ASARCO, L.L.C., 650 F.3d 593, 600-03 (5th Cir. 2011); In re
Tiara Motorcoach Corp., 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (adopting the standards set
forth in S.N.A. Nut Co.); In re Am. W. Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994);
In re Hupp Indus., Inc., 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992).  In particular, a court
should evaluate whether a break-up fee will maximize revenues and the value to be brought into
the debtor's estate.  See S.N.A. Nut Co., 186 B.R. at 105-06; Tiara Motorcoach, 212 B.R. at 137.

41.     The Debtor believes that the proposed Break-Up Fee satisfies this standard.  The
primary circumstances compelling allowance of the Break-Up Fee is to entice First Tek to
facilitate the commencement of the bidding process as quickly as possible, so that a transaction
can be consummated promptly in light of the dwindling value of the Acquired Assets.  There
exist "safeguards beneficial" to the Debtor's estate insofar as the Break-Up Fee will be awarded
only if the Debtor closes on a competing bid or under other limited circumstances.  See S.N.A.
Nut Co., 186 B.R. at 106 (denying break-up fee in the absence of any consummated sale).

42.     The amount of the Break-Up Fee constitutes "a fair and reasonable percentage of
the proposed purchase price," id. at 103 n.5, taking into account the overall financial
commitment of First Tek given the uncertainty caused by the Stratitude/Agama Dispute and the
Criminal Defendants.  Indeed, the amount is customary for similar transactions of this type in the

bankruptcy context and therefore is not "so substantial that it provides a 'chilling effect' on other potential bidders." Id. In sum, the Debtor's ability to offer the Break-Up Fee enables it to ensure the sale of the Acquired Assets to First Tek, which is a contractually committed bidder, at a price the Debtor believes to be fair, while providing the Debtor with the potential of even greater benefit to the estate. The Break-Up Fee therefore should be approved.

43.     Courts will approve bid protection if it is "in the best interest of the bankruptcy estate." *In re Sea Island Co.*, No. 10-21034, 2010 WL 4393269, at *4 (Bankr. S.D. Ga. Sept. 15, 2010) (citing *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 913 (Bankr. D. Ariz. 1994)); *cf. In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (applying the "best interests of the estate" standard in evaluating the use of a break-up fee in a bankruptcy sale). In particular, courts evaluate whether bid protection is sufficient to "move the procedure along toward achieving the highest bid," without being so high as to chill competition. *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 505 (Bankr. C.D. Cal. 1999). The Debtor believes the Bid Protection meets this standard under the present circumstances.

**C.     The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests.**

44.     Under Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property free and clear of any lien, claim, or interest in such property if, among other things:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

26

      (e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

45.     Because Section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will be sufficient to permit the sale of the Acquired Assets free and clear of any and all liens, claims, encumbrances and interests.  *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 827 (N.D. Ill. 1993).  The Debtor believes that the Secured Lenders are the only entities holding liens on the Acquired Assets.  If the purchase price for the Acquired Assets does not exceed the value of Secured Lenders' liens on such assets, then the Debtor is extremely confident that it will procure the consent of the Secured Lenders to the proposed sale of their collateral, thereby satisfying Section 363(f) of the Bankruptcy Code.

46.     At this point in time in the proposed Sale Process, it is difficult to gauge the likelihood of obtaining any competing bids for the Acquired Assets.  In any event, the Debtor believes that the Sale Process proposed herein provides the best, and only, way to maximize the value of the Acquired Assets by allowing the "market" to have one further opportunity to bid for the Acquired Assets, thus benefiting all creditors, the equity security holder and other parties in the interest in the Chapter 11 Case.

47.     Based upon the foregoing, the sale should be approved under Section 363(f) of the Bankruptcy Code.

**D.    The Sale Satisfies the Requirements of Bankruptcy Code Section 363(m) for a Sale Made in Good Faith.**

48.     Section 363(m) reflects that the Bankruptcy Code strongly favors finality of sale orders, and protection of good-faith purchasers to maximize the value of the assets for sale, which

benefits both the debtor and creditors. *See Hower v. Molding Sys. Eng'g Corp.*, 445 F.3d 935, 938 (7th Cir. 2006).

49.     "The requirement that a purchaser act in good faith, of course, speaks to the *integrity of his conduct in the course of the sale proceedings*. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Andy Frain Servs., Inc.,* 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1995, 1198 (7th Cir. 1978)).

50.     In the present case, the Stalking Horse Offer represents the culmination of weeks of intensive due diligence by First Tek, as well as arms' length and good-faith negotiations and discussions between representatives of the Debtor and First Tek.  The Stalking Horse Offer is the result of rigorous, arms-length, good-faith negotiations between the Debtor, First Tek and their respective counsel and other representatives.  To the best of the Debtor's management's knowledge, information and belief, First Tek and the Debtor are unrelated parties[15].

**E.     The Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.**

51.     Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the debtor only if–

(A)     the trustee assumes such contract or lease in accordance with the provisions of this Section; and

(B)     adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

---

[15] First Tek was an unsuccessful bidder for the Q4 Solutions Business Units in the Q4 Chapter 11 Case which were sold last August 2017, but did purchase the Q4 QEDU Education Business Unit pursuant to orders of the Court. "First Tek India", an affiliate of First Tek, provides services in India to Q4, as noted in numerous filings in the Q4 Chapter 11 Case, but has not previously, and does not now, provide any services to Stratitude.

11 U.S.C. § 365(f)(2).

52.    Under Section 365(a), a debtor, "subject to the court's approval, may assume or

reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section

365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory

contract of a debtor.  This subsection provides as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the
> debtor, the trustee may not assume such contract or lease unless, at the time of
> assumption of such contract or lease, the trustee–
>
> (A)    cures, or provides adequate assurance that the trustee will promptly cure,
> such default . . . ;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly
> compensate, a party other than the debtor to such contract or lease, for any actual
> pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or
> lease.

11 U.S.C. § 365(b)(1).

53.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re*

*Res. Tech. Corp.*, 624 F.3d 376, 383 (7th Cir. 2010) (internal citation omitted).  The required

assurance "will fall considerably short of an absolute guarantee of performance." *Id.* (quoting

*Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J.

1988)); *see also In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803-04 (Bankr. N.D. Ill.

1985).

54.    Among other things, adequate assurance may be provided by demonstrating the

assignee's financial health and reputation. *Res. Tech.*, 624 F.3d at 383; *see also, e.g., In re*

*Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance where

29

prospective assignee of lease from debtor had financial resources and expressed its willingness to

devote sufficient funding to business in order to give it strong likelihood of succeeding).

55.    To the extent that any defaults exist under any of the Contracts and Leases that

are to be assumed and assigned in connection with the sale of the Acquired Assets, the Debtor

will either have any such default cured at Closing as a condition of such assumption and

assignment, or obtain consent to the assumption and assignment on such modified terms as may

be agreed to by the non-debtor party to such Contract and Lease.  Moreover, the Debtor will

adduce facts at the Sale Hearing demonstrating the financial wherewithal of the Prevailing

Bidder, its experience in the industry, and its willingness and ability to perform under the

proposed Contracts and Leases to be assumed and assigned to it.

56.    The Sale Hearing therefore will provide the Court and other interested parties

ample opportunity to evaluate and, if necessary, challenge the ability of the Prevailing Bidder to

provide adequate assurance of future performance under the Contacts and Leases to be assumed

and assigned.  The Court therefore should have a sufficient basis to authorize the Debtor to

assume and assign the Contracts and Leases as will be set forth in the Prevailing Bid.

## VII.    NOTICE

57.    On October 24, 2017, the Debtor served notice of the Motion and a copy of the

Motion with all exhibits, via CM/ECF filing, facsimile, and/or overnight delivery,[16] upon the

following persons and/or entities: (a) the Office of the United States Trustee for the Northern

District of Illinois; (b) counsel for the Secured Lenders; (c) counsel to the Committee; (d) the

Debtor's 20 largest unsecured creditors; and (e) all other entities that have filed requests for

notices pursuant to Rule 2002 of the Bankruptcy Rules (collectively, the "**Notice Recipients**").

---

[16] For those entities that filed requests for notices pursuant to Rule 2002, notice of the Motion and a copy thereof was also provided by e-mail delivery to extent an e-mail address was available.

30

Under the circumstances present in this Chapter 11 Case, the Debtor requests that the foregoing

notice be deemed adequate and reasonable under the Bankruptcy Code and Bankruptcy Rules for

purposes of the entry of the Bidding Procedures Order and the commencement of the Sale

Process.

58.     Bankruptcy Rules 2002(a)(2) and 6004(a) require that notice of a proposed sale of

substantially all of a debtor's assets be sent to all creditors.  The Debtor proposes it serve that

notice of the entry of the Bidding Procedures Order requested herein and notice of the Auction

and the Sale Hearing in accordance with Bankruptcy Rules 2002(a)(2) and 6004, to the following

persons: (a) the Notice Recipients; (b) all persons or entities reasonably known by the Debtor to

have a lien on any of the Acquired Assets to be sold; (c) all counterparties to the Contracts and

Leases, including the License Agreements; (d) all taxing authorities and other governmental

units identified in the Debtor's creditors matrix; (e) any other applicable state taxing authorities

for each state where the Acquired Assets are located; and (f) all other creditors in the Chapter 11

Case. Pursuant to Bankruptcy Rule 2002(m), the Debtor asserts that it would be impracticable to

forward this Motion in its entirety to all of its unsecured creditors listed in its creditors matrix on

file herein, and therefore request that the notice of the Auction and the Sale Hearing be made by

delivering to each creditor by U.S. Mail, postage prepaid, a copy of the *Notice of Sale of Assets*

*and Intended Assumption and Assignment of Executory Contracts and Unexpired Leases in*

*Connection Therewith* in the form attached hereto as Exhibit C ("**Notice of Sale**"), within one (1)

business day of entry of the Bidding Procedures Order, and that such notice be deemed adequate

and reasonable under the Bankruptcy Code and Bankruptcy Rules.

## VIII.   <u>CONCLUSION</u>

WHEREFORE, Stratitude, Inc., debtor and debtor in possession herein, respectfully requests the entry of an order: (A) approving the sale process and bidding procedures with respect to the sale of the Business and related Acquired Assets of the estate; (B) approving the form and authorizing the Debtor to enter into the stalking horse agreement in substantially the form attached hereto; (C) approving the bid protection and break-up fee; (D) scheduling a public auction and subsequent sale hearing; (E) authorizing the sale of the assets of the Debtor free and clear of liens, claims, encumbrances and interests; (F) authorizing the assumption and assignment of executory contracts and unexpired leases; (G) approving the form of notice and manner of notice of sale hearing and proposed assumption and assignment; and (H) awarding such other and further relief as is requested herein or is otherwise just and equitable.

Respectfully submitted,

STRATITUDE, INC.

By: /s/ Chad H. Gettleman
       One of its attorneys

CHAD H. GETTLEMAN, ESQ. (ARDC #944858)
NATHAN Q. RUGG, ESQ. (ARDC #6272969)
NICHOLAS R. DWAYNE, ESQ. (ARDC #6308927)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Blvd, Suite 1050
Chicago, Illinois 60604
Tel (312) 435-1050
Fax (312) 435-1059

**Proposed Counsel for the Debtor**